**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **KIM MENEFEE,** | § | |
| *Plaintiff* | § | |
| | § | **A-19-CV-00737-JRN** |
| **-vs-** | § | |
| | § | |
| **N-TITLE, LLC; CAMILLE WHITE;** | § | |
| **AND DON KLEIN;** | § | |
| *Defendants* | § | |

## ORDER

The Court held a bench trial in this matter on June 14-15, 2021. On June 23, 2021, the parties submitted proposed findings of fact and conclusions of law. (Pl.'s Prop. Findings, Dkt. 59, Def.'s Prop. Findings, Dkt. 60). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following order.

## I.     BACKGROUND

### A.  Introduction and Procedural Background

Plaintiff was hired as a closer and escrow officer in N-Title, LLC's ("N-Title") new Austin office in June of 2017 and worked there until her termination in May of 2019. Her position required clearing title so that a borrower seeking a loan was properly vested in title on the real estate when the loan was made.

Plaintiff filed this case on July 23, 2019 against her former employer, N-Title, LLC, and her former supervisors Camille White and Don Klein. (Compl., Dkt. 1). In her complaint, she alleges that the defendants misclassified her under the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 201 *et seq.*, and consequently failed to pay her overtime compensation. *Id.* The Defendants claim that Plaintiff was not due overtime because she was properly classified as exempt under the Administrative and Executive Exemptions to the FLSA. *See* 29 U.S.C. § 213(a)(1). Defendants further claim that while Plaintiff worked ostensibly as an Escrow Officer, she was, in fact, more of a branch manager, and responsible for everything from selecting office decor to interviewing candidates for hire. Plaintiff disputes this claim, suggesting that her official title was also her primary job description and that her other duties were nonexistent or minimal.

On June 1, 2021, the parties jointly agreed to waive their right to a trial by jury and try the case via a bench trial instead. (Notice, Dkt. 43). On June 14-15, the Court held a two-day bench trial. The Court heard testimony from the Plaintiff; Klein; White; the Director of Human Resources for N-Title, Jeanne Toth; Title Processor Maggie Dotson; an employee of sister-company Chesmar Homes, Aleyna Segura; and the receptionist at N-Title, Kendra Breen. *See* (Tr., Dkt. 57–58).

### B.  Executive and Administrative Exemptions

The FLSA requires employers to pay overtime to employees who work more than forty hours in a given week. 29 U.S.C. § 207(a)(1). Overtime must be paid at a rate of at least one and one-half times the employee's regular hourly rate. *Id.* Some employees are exempt from the FLSA's overtime requirement. Relevant here, "bona fide executive [or] administrative" employees are exempt and therefore do not have the right to overtime compensation. 29 U.S.C. § 213(a).

An employee is exempt under the executive employee exemption when: (1) the employee is compensated on a salary basis at a rate not less than $684 per week; (2) the employee's primary duty is management of the enterprise in which the employee is employed or of a

customarily recognized department or subdivision thereof; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100.

"The term 'primary duty' means the principal, main, major, or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The FLSA specifies four factors that should be considered when determining an employee's primary duty: (1) the relative importance of the employee's exempt duties, (2) the amount of time the employee spends performing exempt work, (3) the employee's relative freedom from direct supervision, and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* "The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFT-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990).

Generally, "management" includes the following activities:

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Factors to be considered when determining if an employee's recommendations are given "particular weight" include: "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. "It does not include an occasional suggestion with regard to the change in status of a co-worker." *Id.* An employee's recommendations may still be said to have had "particular weight" even if the employee does not have authority to make the ultimate decision as to the employee's change in status. *Id.*

An employee is exempt under the administrative exemption when: (1) the employee is compensated on a salary basis at a rate not less than $684 per week: (2) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

"The phrase 'directly related to the management or general business operations' . . . [means] work directly related to assisting with the running or servicing of a business, as distinguished, for example, from working on a manufacturing production line or selling a product." 29 C.F.R. § 541.201.

Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include:

> "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the

employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

29 C.F.R. § 541.202.

## II.   FINDINGS OF FACT

Here, there is no dispute that plaintiff was compensated on a salary basis at a rate greater than $684 per week. There was also no dispute over the number of overtime hours in the event Defendants did not demonstrate Plaintiff's exempt status. The questions at issue in the bench trial, then, were whether Defendants satisfied their burden of demonstrating by a preponderance of the evidence that Plaintiff's primary duties at N-Title qualified her for the executive or administrative exemptions and whether, if Plaintiff should not have been exempt, Defendants' decision to classify her as such was willful.

Having reviewed the evidence presented by the parties, the Court finds that:

1.      From on or about June 5, 2017, until on or about May 1, 2019, Plaintiff worked for Defendants as an escrow officer in Austin, Texas. An escrow officer obtains a license by filling out an application, being bonded and having a background check, with no previous training or testing required.[1]

---

[1] *See* PX 1 (Plaintiff's employment proposal).

2.      At all times material to this case, N-Title employed two or more employees and had an annual dollar volume of sales or business done of at least $500,000.[2]

3.      At all times material to this case, Defendants Klein and White actively ran the business of N-Title on a day-to-day basis; acted directly or indirectly in the interest of N-Title in relation to Plaintiff's employment; and/or were substantially in control of the terms and conditions of Plaintiff's work.[3]

4.      At all times material to this case, Defendants Klein and White had the ability to hire and fire employees, supervised or controlled employees' work schedules and conditions of employment, and/or determined the rate and method of payment of wages to employees.[4]

5.      At all times material to this case, Defendants Klein and White were Plaintiff's employer as defined by 29 U.S.C. § 203(d).[5]

6.      At N-Title, transactions handled by an escrow officer involved the lending of money by a customer to borrowers against the value of real estate owned by the borrower, with the customer receiving a title insurance policy from N-Title. Escrow officers were responsible for clearing title so a borrower seeking a loan was properly vested in title on the real estate when the loan was made.[6]

7.      As an escrow officer for N-Title, Plaintiff's primary duties included: ordering title insurance in accordance with the lender's requirements; working to clear title so that the borrower was properly vested in title on the real estate when the loan was made; preparing

---

[2] *See* (Second Am. Answer, Dkt. 30, at ¶ 10) (admitting the same).
[3] *See* (Second Am. Answer, Dkt. 30, at ¶ 13) (admitting the same with respect to White; admitting that Klein "acted . . . directly in the interest of N-Title); (Trial Tr., Vol. 1, p. 99) (Toth, describing Klein as a "supervisor"); *Id* at p. 86–88 (Klein, admitting he is CEO of N-Title, describing job duties from 2017-19 as "oversee[ing] the operations" of N-title, admitting he supervises White); *Id.* at p. 198–99 (White, admitting Klein exercises financial control over N-Title and has the "right to say whether the business continues or not").
[4] *See* (Second Am. Answer, Dkt. 30, at ¶ 12) (admitting the same).
[5] *See* (Second Am. Answer, Dkt. 30, at ¶ 12) (admitting the same).
[6] *See* DX 6, at 1–2.

closing statements; and, if the title was clear and lender requirements were met, consummating the closing.[7]

8.      To clear title, Plaintiff had to review the title commitment to confirm the name of the borrower, the legal description of the property, and the loan amount were correct. Plaintiff also had to check liens and their priority to ensure that the lender's lien position was consistent with the lender's closing instructions. If the lender's closing instructions required a first lien position for the lender, Plaintiff had to ensure that other liens had been paid off or subordinated. The closing instructions from the lender set the guidelines that Plaintiff had to ensure were met. If there were any discrepancies in the information, Plaintiff had to contact the borrower, lender, and/or seller. Plaintiff could not disregard the lender's closing instruction guidelines; rather, Plaintiff was bound to follow these guidelines in determining if clear title could be transferred at closing.[8]

9.      At all times material to this case, Plaintiff was individually engaged in interstate commerce, as her work was directly related to the movement of things (including information) across state lines. Plaintiff's regular and recurring work included the use of the Internet, telephone, email, and other channels of interstate commerce.[9]

10.      From June 5, 2017 to December 31, 2017, Plaintiff's annual salary was $52,000. This salary compensated Plaintiff for 2,080 hours per year or 40 hours per week. During this time, Plaintiff's regular rate was $25 per hour and Plaintiff's one and one-half overtime rate was

---

[7] *See* (Second Am. Answer, Dkt. 30, at ¶ 15) (admitting this list is inclusive of Plaintiff's duties); (Trial Tr., Vol. 1, p. 23) (Plaintiff describing her primary duties as "routine, recurring, [and] repetitive"; describing 85-90 percent of her time on title closings); (Trial Tr., Vol. 2, p. 20) (co-worker Breen estimating Plaintiff spent 75 percent of her time on title closings).

[8] *See* (Second Am. Answer, Dkt. 30, at ¶ 16) (admitting to this list, except disputing that Plaintiff could not disregard lenders' closing instructions, because she "should not" do so, but "could"); (Trial Tr., Vol. 1, p. 23–25) (Plaintiff testifying affirmatively to this list); *Id.* at 127 (coworker Dotson, testifying that Plaintiff "led all the files, in essence doing all the paperwork for them, the closing disclosure, all of that").

[9] *See* (Trial Tr., Vol. 1, p. 22–23) (Plaintiff testifying to the same).

$37.50 per overtime hour. During this time, Plaintiff worked 313.8 hours of overtime for which she was not paid. Thus, Plaintiff's unpaid overtime for this time period amounts to $11,767.50.[10]

11.      From January 1, 2018 to December 31, 2018, Plaintiff's annual salary was $55,000. This salary compensated Plaintiff for 2,080 hours per year or 40 hours per week. During this time, Plaintiff's regular rate was $26.44 per hour and Plaintiff's one and one-half overtime rate was $39.66 per overtime hour. During this time, Plaintiff worked 565.51 hours of overtime for which she was not paid. Thus, Plaintiff's unpaid overtime for this time period amounts to $22,428.13.[11]

12.      From January 1, 2019 to May 1, 2019, Plaintiff's annual salary was $56,000. This salary compensated Plaintiff for 2,080 hours per year or 40 hours per week. During this time, Plaintiff's regular rate was $26.92 per hour and Plaintiff's one and one-half overtime rate was $40.38 per overtime hour. During this time, Plaintiff worked 104.31 hours of overtime for which she was not paid. Thus, Plaintiff's unpaid overtime for this time period amounts to $4,212.04.[12]

13.      Plaintiff's total amount of unpaid overtime compensation for the time she worked at N-Title amounts to $38,407.67.

**Findings of Fact Related to the Executive Exemption**

---

[10] See DX 6, at 1 (job description specifying position as 40 hours per week); (Trial Tr., Vol. 1, p. 25) (Plaintiff testifying her regular hours were 8am to 5pm, Monday through Friday); PX 1, at 4 (Plaintiff's 2017 pay rate form); PX 22, at 1 (Plaintiff's records of 2017 hours); PX 19 (Plaintiff's spreadsheet of total overtime hours from 2017 through 2019); (Trial Tr., Vol. 1, at 189) (White testifying she has no evidence to contradict the hours Plaintiff indicates she worked).

[11] See DX 6, at 1 (job description specifying position as 40 hours per week); (Trial Tr., Vol. 1, p. 25) (Plaintiff testifying her regular hours were 8am to 5pm, Monday through Friday); PX 22, at 2–11 (Plaintiff's records of 2018 hours); PX 19 (Plaintiff's spreadsheet of total overtime hours from 2017 through 2019); (Trial Tr., Vol. 1, at 189) (White testifying she has no evidence to contradict the hours Plaintiff indicates she worked).

[12] See DX 6, at 1 (job description specifying position as 40 hours per week); (Trial Tr., Vol. 1, p. 25) (Plaintiff testifying her regular hours were 8am to 5pm, Monday through Friday); PX 22, at 12–16 (Plaintiff's records of 2019 hours); PX 19 (Plaintiff's spreadsheet of total overtime hours from 2017 through 2019); (Trial Tr., Vol. 1, at 189) (White testifying she has no evidence to contradict the hours Plaintiff indicates she worked).

14.     Plaintiff's primary duties at N-Title did not include managing the enterprise of N-Title or any department or subdivision thereof.[13]

15.     Plaintiff did not regularly direct the work of at least two or more other full-time employees or their equivalent.[14]

16.     Plaintiff did not have authority to hire, fire, advance, promote, or in any other way affect or change the status of other employees. Her suggestions and recommendations related to the foregoing were given no particular weight by Defendants.[15]

### Findings of Fact Related to the Administrative Exemption

---

[13] The Court, in its capacity as factfinder, found the testimony of the Plaintiff sincere and believable. *See* (Trial Tr., Vol. 2, p. 27–28) (Plaintiff testifying she was never told by Defendants she was "supervisor," "team lead," "manager," or "responsible for on-site operations" of the Austin office); (Trial Tr., Vol. 1, p. 195–97) (White admitting Plaintiff did not perform work at N-Title related to tax returns, finance reports, accounting, auditing corporate files, budgeting, purchasing insurance, giving input into performance evaluations, binding N-Title in matters of significant financial impact, business planning, safety and health of employees, employee benefits, public relations, government relations, managing computer networks, internet and database administration, or compliance with state or federal law); *Id*. at 64–66 (Plaintiff denying she performed the same); *Id.* at 118–19 (coworker Dotson testifying to never witnessing Plaintiff performing the same); *Id.* at 207 (White admitting she could not point to a time where she told Plaintiff that Plaintiff was "team leader," "branch manager," etc.); *Id.* at 43 (Plaintiff admitting she purchased decorations for one room of the office, but did so at the direction of N-Title executives); *Id.* at 196 (White testifying the $300 Plaintiff spent at Hobby Lobby on decorations did not, in White's opinion, qualify as a significant financial purchase).

[14] The Court, in its capacity as factfinder, found the testimony of the Plaintiff and coworker Maggie Dotson sincere and believable. Contrarily, the testimony of Defendant Don Klein was less sincere and believable because he seemed rehearsed and forthcoming on direct examination but withholding during cross examination. *See* (Trial Tr., Vol. 1, p. 69) (Plaintiff testifying she did not regularly supervise or direct work of coworkers Dotson and Breen); *Id.* at 75 (Plaintiff testifying she did not manage the workflow of the Austin office; the task-assigning software "Dashboard" managed the workflow and White created the assignments input into Dashboard); *Id.* at 55 (Plaintiff denying delegation of work to coworker Breen); *Id.* at 199 (White testifying organizing the Dashboard was not Plaintiff's primary duty and admitting no knowledge how many hours Plaintiff spent doing the same); *Id.* at 200 (White admitting to describing Plaintiff and Dotson as "equals" and that Dotson reports to White); PX 8, at 7–8 (receptionist job description listing White and another individual, not Plaintiff, as supervisors); (Trial Tr., Vol. 2, at 26) (coworker Breen stating belief White had sole administrative control over Dashboard); (Trial Tr., Vol. 1, at 115) (Dotson testifying she did not report to Plaintiff); *Id.* at 122 (Dotson describing her and Plaintiff as a "team" and testifying she considered Plaintiff her equal); *Id.* at 141–42 (Dotson stating her salary was $60,000—higher than the Plaintiff's at any time during Plaintiff's employment with N-Title).

[15] *See* (Trial Tr., Vol. 1, p. 73) (Plaintiff testifying she had no authority to hire employees); *Id.* at 53 (Plaintiff testifying she did not participate in coworker Breen's interview, but met her at a "meet and greet" at the direction of N-Title executives); *Id.* at 74 (Plaintiff testifying she was not involved in the hire of Dotson); *Id.* at 69–70 (Plaintiff testifying she did not participate in performance reviews of coworkers); *Id.* at 191–93 (White admitting Plaintiff did not have authority to hire employees and Plaintiff did not "recommend" hiring Dotson); *Id.* at 195–96 (White admitting Plaintiff did not have authority to fire employees); *Id.* at 72–73 (Plaintiff testifying her recommendation against the hiring of a certain receptionist was ignored, because her superiors interviewed the candidate again anyway).

17.     Plaintiff's primary duties at N-Title did not include the performance of office or non-manual work directly related to the management or general business operations of N-Title or N-Title's customers.[16]

18.     While working at N-Title, Plaintiff did not exercise discretion or independent judgment with respect to matters of significance. Plaintiff did not formulate policy or procedure and could not deviate from existing policies and procedures without the approval of a supervisor or lender.[17]

### III.     CONCLUSIONS OF LAW

The Court must now determine, based on the evidence presented at trial, whether Plaintiff has proven her case for unpaid wage compensation and other relief under the FLSA. The Court concludes the following:

1.     Plaintiff did not qualify for either the executive or administrative FLSA exemptions from overtime pay under 29 U.S.C. § 213(a)(1).

2.     Defendants misclassified Plaintiff as exempt from the FLSA's overtime pay requirements. Therefore, Plaintiff is entitled to unpaid overtime compensation.

---

[16] *See* (Trial Tr., Vol. 1, p. 75) (Plaintiff testifying she did not manage the workflow of the Austin office; Dashboard managed the workflow and White created the assignments input into Dashboard); *Id.* at 195–97 (White admitting Plaintiff did not perform work at N-Title related to tax returns, finance reports, accounting, auditing corporate files, budgeting, purchasing insurance, giving input into performance evaluations, binding N-Title in matters of significant financial impact, business planning, safety and health of employees, employee benefits, public relations, government relations, managing computer networks, internet and database administration, or compliance with state or federal law); *Id.* at 64–66 (Plaintiff denying she performed the same); *Id.* at 118–19 (coworker Dotson testifying to never witnessing Plaintiff performing the same); *Id.* at 113 (N-Title Chief Solutions Officer Leanne Sims testifying Plaintiff was never responsible for all of the steps in the escrow process at N-Title).

[17] *See* (Trial Tr., Vol. 1, p. 24) (Plaintiff testifying to certain limitations on her discretionary authority); *Id.* at 189–90 (White admitting to the same limitations on Plaintiff's discretionary authority). Much of the testimony at trial concerned whether Plaintiff created a policy called the 48-Hour Rule, under which customers needed to turn in certain paperwork by a certain deadline. In the Court's opinion, this is a minor point, insufficient to establish the "policy" contemplated by the FLSA. Nevertheless, the Court believes Plaintiff's testimony that an N-Title executive, not Plaintiff, was the origin of the rule. *See* (Trial Tr., Vol. 2, p. 29).

## IV.    RELIEF

### A.  Statute of Limitations and Willfulness

"Generally, FLSA claims are subject to a two-year statute of limitations, however the limitations period is three years for willful violations." *Steele v. Leasing Enter., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016) (citing 29 U.S.C. § 255(a)). Plaintiff has the burden of demonstrating willfulness. *Id.* To meet that burden, Plaintiff "must demonstrate that an employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133–34 (1988)). Reckless disregard usually requires that the employer must have "ignore[d] complaints brought to their attention." *Mohammadi v. Nwabuisi*, 606 F. App'x 329, 332 (5th Cir. 2015). "[N]either knowledge of the FLSA's potential applicability nor negligent or unreasonable conduct necessarily establishes willfulness." *Id.*

There is no evidence in the record that anyone at N-Title knew Plaintiff was misclassified under the FLSA. There is also no evidence in the record to show that N-Title ignored complaints about FLSA misclassification. There is, however, some evidence that individuals at N-Title could have been more careful in correctly classifying escrow officers under the FLSA. For instance, both Klein and White testified they took no steps or extremely rudimentary steps in determining an escrow officer's FLSA qualification. *See* (Trial Tr., Vol. 1, p. 96–97, 215–16). Additionally, the Human Resources Director for N-Title admitted she could not point to authorities for the classification as exempt and took no steps to determine the propriety thereof. *Id.* at 99. Lastly, White herself worked as an escrow officer under a previous employer and was non-exempt. *See id.* at 189. It is possible, however, that these oversights were made in a rushed and careless manner. It is also possible that Defendants truly (and incorrectly) believed

Plaintiff's status as the most senior escrow officer, her meeting with a potential colleague before that colleague was hired, her $300 purchase of office decorations, her coworkers' practice of asking her for advice, and/or her status as the go-to employee in the Austin office for sister company Chesmar Homes qualified her as exempt. Regardless, at most, Defendants' choice to classify Plaintiff as exempt was "negligent or unreasonable conduct" and therefore cannot support a finding that Defendants willfully violated the FLSA. *See Mohammadi*, 606 F. App'x at 332.

### B. Liquidated Damages and Good Faith

Plaintiff also requests an award of liquidated damages. "Generally, the FLSA 'mandates' that a plaintiff awarded . . . unpaid overtime compensation must also be awarded liquidated damages in an equal amount." *Sanders v. Walkingspree USA, Ltd.*, No. 1:15-CV-500-RP, 2017 WL 1968860, at *4 (W.D. Tex. Feb. 17, 2017) (citing *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 246 (5th Cir. 2016)). "Effectively, the liquidated damages provision doubles the amount of relief available to an FLSA plaintiff." *Id.* "There is an exception to this rule in cases where the defendant is able to satisfy the 'substantial burden' of demonstrating 'that its acts giving rise to the suit are both in good faith and reasonable." *Id.* (citing *Steele*, 826 F.3d at 246). The liquidated damages question is similar to the willfulness question, but while "the employer has the burden of demonstrating good faith and reasonableness to avoid assessment of liquidated damages, the employee has the burden of demonstrating willfulness for the three-year limitations period to apply." *Mohammadi*, 605 F. App'x at 332. Ultimately, the decision to award liquidated damages is left to the discretion of the trial court. *See Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003).

Just as the evidence presented at trial precludes a finding of willfulness, it precludes a finding of good faith and reasonableness. Defendants argue they acted with a subjectively good faith belief because (a) White was experienced with the FLSA, (b) the executive team discussed FLSA exemptions, (c) N-Title has both exempt and non-exempt employees, (d) the N-Title employee handbook acknowledges different classes  and exemptions of employees, and (e) the Director of HR testified that Plaintiff was hired to be the branch manager in Austin and similar positions are nonexempt. Arguments (a)-(d) are irrelevant, or, if anything, cut both ways. The fact that exempt and non-exempt statuses were discussed frequently by N-Title executives could demonstrate a plan to try to craft a position for Plaintiff that narrowly avoids FLSA overtime requirements. As for argument (e), the Court has already determined that Plaintiff was hired to be an escrow officer and dismissed Defendants' contention she was hired for some other purpose. The Court finds that Defendants have not met their burden of showing they acted with good faith.

Because the Court has found Defendants have not met their burden of showing they acted with good faith, it is not necessary to consider whether they acted with objective reasonableness. Nevertheless, the Court concludes Defendants have also not met this burden. As discussed above, White and Klein both testified as to taking no steps, or very minimal steps in determining proper FLSA exempt status. *See* (Trial Tr., Vol. 1, p. 96–97, 215–16). Good faith includes a duty to investigate potential liability under the FLSA. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir. 1979). Where White was a former escrow officer with nonexempt status, this duty should have been obvious. The Court concludes Defendants have also not met their burden of showing they acted with objective reasonableness.

Because Defendants have not shown they acted with good faith or objective reasonableness, they have not met their "substantial burden" to preclude an award of liquidated damages. Those damages must therefore be awarded. *See* 29 U.S.C. § 216(b).

### C.  Fluctuating Work Week

Defendants argue that damages should be calculated using an alternative method known as the fluctuating work week ("FWW") method. As a general rule, "[t]he FLSA sets the standard workweek at forty hours and requires employers to pay non-exempt employees no less than one and one-half times their regular rate of pay for any hours worked in excess of forty." *Black v. SettlePou, P.C.*, 732 F.3d 492, 496 (5th Cir. 2013) (citing 29 U.S.C. § 207(a)(1)). FWW is "one method of satisfying the FLSA's overtime pay requirement" that provides for "an employment arrangement in which an employee receives a fixed weekly pay for a fluctuating work schedule with a varying number of hours worked each week." *Id.* Such an arrangement is permitted if: (1) "the amount of salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage for every hour worked in those workweeks in which the number of hours he works is greatest," and (2) if the employee "receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay." 29 C.F.R. § 778.114(a).

"The decision of when and how to apply the FWW's half-time formula in misclassification cases has divided the federal courts." *SettlePou*, 732 F.3d at 497 (collecting cases and explaining the disagreement among appellate courts). The Fifth Circuit has held that the method "may only be applied to calculate overtime premiums when there is a contractual agreement between the employer and the employee that the employee will be paid a fixed weekly wage for hours that fluctuate from week to week." *Id.* at 500. In determining whether an

employee entered into such an agreement, courts look to "[t]he parties' initial understanding of the employment arrangement as well as the parties' conduct during the period of employment." *Id.* at 499.[18]

Defendants argue that there was a "clear mutual agreement between Plaintiff and Defendants that Plaintiff would be paid a fixed salary regardless of the number of hours she worked rather than a fixed salary for a fixed number of hours per week." Even if the Defendants are correct about this agreement, that is not the standard for establishing the FWW method. Defendants would need to show that there was an agreement between the parties that Plaintiff's regular hours would fluctuate on a weekly basis, *not* that Plaintiff understood she would have to work whatever hours were required for the job. Regardless, the Court finds no evidence in the record of any such agreement, and there is evidence to suggest that Plaintiff believed her job would be 40 hours per week. *See* DX 6, at 1 (job description specifying hours at 40 per week); (Trial Tr., Vol. 1, p. 25) (Plaintiff testifying her regular hours were 8-5, Monday through Friday);

---

[18] Defendants argue that Plaintiff has the burden of proving the FWW method does not apply to her case. *See* (Def. Prop. Findings, Dkt. 60, at 38) (citing *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001). Defendants are incorrect. In all fairness, the wording of *Apollo* heavily suggests that Plaintiff has the burden of proof: "This Court has never directly addressed the issue of which party—whether the employer or the employee— has the burden of proving compliance with the requirements of the FWW method. We hold that the employee has this burden." *Id.* However, *Apollo* goes on to clarify that the Employee only has the burden of proving *an improper application* of the FWW method. "[T]he employee bears the burden of proving that the employer failed to properly administer the FWW Method." *Id.* Other courts considering this question have interpreted *Apollo* similarly. *See Howe v. Hoffman-Curtis Partners, Ltd. LLP*, No. H-03-4298, 2005 WL 6443877, at *2–3 (S.D. Tex. July 6, 2005). The *Howe* Court explained that reliance on *Apollo* for the proposition that the employee has the burden of proof to show that the employee has the burden of proof to overcome the FWW method is misguided. *Id.* The court continued that the employee in *Apollo* was suing to show that the employer had improperly applied the FWW method—even though both parties believed that method should apply. In that set of circumstances, it is the Plaintiff's burden to show that the method was misapplied. However, where Plaintiff has never claimed that Defendants unlawfully used or applied the method, it cannot be Plaintiff's burden—"Plaintiff cannot be expected to prove something that is not an element of her claim." *Id.*; *see also Hanson v. Camin Cargo Control, Inc.*, No. H-13-0027, 2015 WL 1737394, at *2 (S.D. Tex. Apr. 16, 2015) (citing *Apollo* for the proposition that "[t]he employee bears the burden to prove all the elements of his overtime claim, including a claim that the employer improperly applied the so-called fluctuating workweek method of payment."). However, even if the Court is incorrect in its analysis of *Apollo*, the Fifth Circuit requires evidence of an agreement between the parties to apply the FWW method, which is not present in this case.

PX 6, at 1 (email from White stating extra-hour days should not be "common or frequent"). The Court holds that the FWW method does not apply.

### D.  Damages Conclusion

There is no dispute over the specific hours Plaintiff worked during her time at N-Title. Therefore, the Court will calculate damages based on Plaintiff's records of those hours. Plaintiff requests damages from July 1 to December 17 of 2017 and claims an unspecified damages figure for those days. However, because the complaint was filed July 23, 2019 and the case is subject to a two-year statute of limitations, Plaintiff is not entitled to damages from July 1 to July 22 of 2017. There are 169 days in 2017 with estimated, unspecified hours. The 21-day period of July 1 to July 22 amounts to 12.4% of the 169-day period. Thus, Plaintiff's damages award for the estimated hours from July 1 to December 17 must be reduced by 12.4%.

Plaintiff requests damages for 299 overtime hours for the period from July 1 to December 17, 2017. 12.4% of this number is 37.07 hours, which, multiplied by Plaintiff's 2017 overtime hourly rate of $37.50 results in a reduction to Plaintiff's 2017 damages of $1,390.13. Her damages for 2017 are therefore $10,377.37. Her award for 2018 ($22,428.13) and for 2019 ($4,212.04) are unchanged.

The Court concludes that Plaintiff is entitled to $37,017.54 in unpaid overtime compensation and $37,017.54 in liquidated damages.

### E.  Attorney Fees and Costs

The FLSA states that in an action arising under the Act, the Court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b).

To determine the amount of a reasonable attorney's fee, the Fifth Circuit applies a two-step process. *SettlePou*, 732 F.3d at 502. First, the Court calculates the fee using the "lodestar" method by "multiplying the number of hours an attorney reasonably spent on the case by an appropriate hourly rate, which is the market rate in the community for this work." *Id.* "There is a strong presumption of the reasonableness of the lodestar amount." *Id.* (citing *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010)). However, "[p]laintiffs seeking attorney's fees have the burden of showing the reasonableness of the hours billed and that the attorneys exercised billing judgment." *Id.* "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prod. Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006). "The court should exclude all time that is excessive, duplicative, or inadequately documented [and] [t]he hours surviving this vetting process are those reasonably expended in litigation." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).

After calculating the "lodestar", the Court should increase or decrease the amount of attorney's fees based on the relative weight of twelve factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.

*SettlePou*, 732 F.3d at 501. However, the Court may not adjust the lodestar due to one of these factors if it was already taken into account during the initial calculation of the lodestar. *Id.* at 501.

### A.  The Lodestar Calculation

The "lodestar" method consists of "multiplying the number of hours an attorney reasonably spent on a case by an appropriate hourly rate, which is the market rate in the community for this work." *SettlePou*, 732 F.3d at 502. The Court will address separately the issues of hours reasonably spent on the case and the prevailing market rate for this type of work in the community.

**Hours reasonably expended in litigation.**

Plaintiff states that one attorney and two paralegals spent a total of 472.4 hours on this litigation, amassing a total of $104,362.50 in attorney fees. (Dkt. 55-1). According to an affidavit submitted by Plaintiff's attorney Emily Frost, Ms. Frost spent 183.5 hours on the case, her paralegal Glenda Branch spent 224.9 hours on the case, and her paralegal Forrest Culotta spent 64 hours on the case. In support of her calculations, Ms. Frost provides billing records for the case and a supporting affidavit from Ms. Frost attests to the reasonableness and necessity of the total hours expended.

Defendants object to Plaintiff's failure to discount for clerical work performed by Ms. Branch and to "block billing" in the billing records. First, Defendants argue that a large portion of the work performed by Ms. Branch is not legal work that requires a paralegal and is instead clerical in nature. Defendants rely on *Saldivar v. Austin Indep. Sch. Dist.*, No. A-14-CA-117-SS, 2016 WL 1064654, at *4 (W.D. Tex. Mar. 14, 2016), *aff'd*, 675 F. App'x 429 (5th Cir. 2017) for the argument that clerical work is inappropriate to bill. *Saldivar* does not support that argument. In fact, *Saldivar* makes clear that while clerical work does not merit the same hourly rate as attorney work, $60 to $200 per hour is an appropriate rate for paralegal work. *Id.*; *see also Walker v. U.S. Dept. of Hous. and Urban Dev.*, 99 F.3d 761, 770 (5th Cir. 1996) ("Clerical work, however, should be compensated at a different rate from legal work."). The Court therefore finds

that the rate charged by Ms. Branch and Mr. Culotta, which ranged from $125 to $150 per hour, is appropriate. Defendants further claim that "Ms. Frost billed at least 1.5 hours of clerical work" (and charged her normal attorney fee), but do not clarify which work they view as clerical, so that objection is overruled.

Second, Defendants object to the use of "block billing" in the time-keeping records submitted by Plaintiff. When seeking attorney fees, "[t]he fee applicant should exercise 'billing judgment' and keep billing time records in a way that enables the reviewing court [to] 'identify distinct claims.'" *Carroll v. Sanderson Farms, Inc.*, No. H-10-3108, 2014 WL 549380, at *8 (W.D. Tex. Feb. 11, 2014). Block billing can "undermin[e] the Court's reasonableness inquiry." *Burns v. Nielsen*, No. EP-17-CV-264-DCG, 2021 WL 534711, at *13 (W.D. Tex. Feb. 12, 2021). Defendants claim that several entries are block billed and "it is difficult to separate out the reasonable from the unreasonable," so a global reduction of fees is warranted.

The Court disagrees that Block Billing is a problem in this case. Entries in this case include the following: (1) an entry from Ms. Branch, "Receive and review Court Order regarding deadline for filing of joint proposed scheduling order; email correspondence with Mrs. Frost regarding preparation of same. Update litigation calendar for Ms. Frost with deadline for same."; (2) an entry from Ms. Frost, "Draft response to Klein motion to dismiss and affidavit for Ms. Menefee; research and analysis regarding same; communications to/ from Ms. Menefee about same; communications to/from paralegal about same; oversee filing and service of same."; and (3) an entry from Mr. Culotta, "Memo to EF re liquidated damages under FLSA. Assignment review (Memos and FOF/COL). Drafting memos, reviewing cases, printing docs, and other misc trial prep. Memo re FLSA SOL and 'reckless disregard.'" Certainly, other entries are less detailed, but nothing strikes the Court as impeding its ability to identify distinct claims.

The Court finds that all of Plaintiff's claimed hours were reasonable.

**Prevailing Market Rate.** In determining the number of hours reasonably expended on the litigation, the Court must determine "an appropriate hourly rate, which is the market rate in the community for this work." *SettlePou*, 732 F.3d at 502. The Court is to determine the prevailing market rates based upon the rates in the community in which the district sits. *Meesook v. Grey Canyon Family Med., P.A.*, No. 5:13-CV-729-XR, 2014 WL 5040133, at *3 (W.D. Tex. Oct. 8, 2014) (citing *Tollet v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002)).

Plaintiff submits an affidavit from Emily Frost. Ms. Frost's affidavit states her rate during this case was $325 per hour until 2021 when it increased to $375 per hour, that she has practiced law since 2002, and that she is Board Certified in Labor and Employment Law. Ms. Frost's fees are similar to or less than those charged by the Texas-based attorneys discussed in *Rodriguez v. Mech. Tech. Servs., Inc.*, No. 1:12-CV-710-DAE, 2015 WL 8362931, at *5 (W.D. Tex. 2015 Dec. 8, 2015) who were similarly experienced and credentialed. Her paralegal Glenda Branch has 25 years of experience as a legal assistant. Her other paralegal, Forrest Culotta is also a third-year law student. The paralegals' fees ranged from $125 to $150 per hour. As explained above, their hourly rates fall well within the market rate for paralegals in Texas. *See Saldivar*, 2016 WL 1064654 at *4. There is no argument from Defendants that any of the hourly rates charged by Ms. Frost or her paralegals are excessive. The Court finds that the hourly rates charged in this case are appropriate hourly rates in the community for this type of work.

Thus, the Court finds that an initial lodestar of $104,362.50 is appropriate.

## B. Lodestar Adjustments

After calculating the "lodestar" the Court may enhance or decrease the amount of attorney's fees based on the relative weight of twelve factors set forth in *SettlePou*, 732 F.3d at

502. There is a strong presumption of the reasonableness of the lodestar amount. *Saizon*, 448 F.3d at 799–800. The Court will consider each of the twelve factors in turn.

**Time and labor required to represent the client.** Plaintiff claims that this factor should be increased because Don Klein initially maintained he was not an employer under the FLSA but later stipulated to the same, and that he did not immediately verify his interrogatories. Defendants respond that Plaintiff fails to show how these events justify an increase to the lodestar. The Court agrees with Defendant. Mr. Klein had a justifiable, albeit shaky, foundation on which to claim he was not Plaintiff's employer. And a delay in verifying interrogatories, frustrating and wrong as it may be, does not justify an increase to lodestar. No increase in the lodestar is merited by this factor.

Defendants claim the clerical work and block billing to which they objected merit a decrease in the lodestar under this factor. As discussed above, the Court does not agree those billing issues present a problem, and even if they did, they are not properly addressed under this factor. No reduction in lodestar is merited by this factor.

**Novelty and Difficulty of Issues.** Neither party requests an adjustment to the lodestar under this factor. Because this case boils down to a factual dispute and presented no novel or difficult legal questions, no adjustment in lodestar is merited by this factor.

**Skill requisite to perform the legal service properly.** The Fifth Circuit directs that a Court should "closely observe the attorney's work product, his preparation, and general ability before the Court." *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974), *rev'd on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87, 90 (1989). The attorneys have performed strongly before this Court, but the Court does not find that this factor should enhance

the lodestar because the Court considered the skills of Plaintiff's attorney in its analysis of a reasonable hourly rate.

**Preclusion of other employment by the attorney due to acceptance of the case.** This was a single-plaintiff case which is not likely to cause otherwise available business to be unavailable to Plaintiff's counsel because of conflicts of interest. No adjustment is merited under this factor.

**The customary fee.** There is nothing in the parties' briefing to suggest that the lodestar should be adjusted under this factor. The Court finds no adjustment is merited.

**Whether the fee is fixed or contingent.** Plaintiff suggest the lodestar should be increased because the fee is contingent. The Court finds no adjustment is merited.

**Time limitations imposed by the client or circumstances.** There is nothing in the parties' briefing to suggest that the lodestar should be adjusted under this factor. The Court finds no adjustment is merited.

**Amount involved and results obtained.** Defendants suggest that if their settlement offer of $40,000 exceeds the amount of damages Plaintiff is awarded by the Court, the lodestar should be reduced. The settlement offer is less than the amount of damages awarded, so no reduction is merited. Plaintiff does not suggest any reason that the lodestar should be increased under this factor. Finding none, the Court will not adjust the lodestar.

**Experience, reputation, and ability of the attorneys.** There is nothing in the parties' briefing to suggest that the lodestar should be adjusted under this factor. The Court finds no adjustment is merited.

**The "undesirability" of the case.** There is nothing in the parties' briefing to suggest that the lodestar should be adjusted under this factor. The Court finds no adjustment is merited.

**Nature and length of the professional relationship with the client.** There is nothing in the parties' briefing to suggest that the lodestar should be adjusted under this factor. The Court finds no adjustment is merited.

**Awards in similar cases.** Plaintiff argues the lodestar should be increased because attorney fee awards in other FLSA unpaid overtime cases are higher. The Court disagrees and finds no adjustment is merited.

### C.  Costs

Plaintiff submitted a Bill of Costs in the amount of $6,899.13. This Court may tax as costs the following: (1) fees of the clerk or marshal; (2) fees for printed or electronically recorded transcripts obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. § 1920; (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretations services under 28 U.S.C. § 1828; and (7) witness attendance fees of $40 per day and fees for the time necessarily occupied in going to and returning from the place of attendance. 28 U.S.C. §§ 1821, 1920. The Court finds that all costs are eligible under 28 U.S.C. §§ 1821 and 1920. Accordingly, the Court awards Plaintiff costs in the sum of $6,899.13.

### D.  Fees and Costs Conclusion

In sum, the Court's calculated lodestar is $104,362.50. None of the twelve factors discussed in *SettlePou* justify an enhancement or reduction in the lodestar. Therefore, the Court awards Plaintiff a total of $104,362.50 in attorney's fees. The Court awards Plaintiff $6,899.13

in costs. The Court does not, at this time, award any additional attorney fees, but Plaintiff's request for additional fees in the event of an appeal is denied without prejudice.

## V.     CONCLUSION

Pursuant to the reasoning herein, the Court enters the following orders:

**IT IS ORDERED** that judgment be entered in favor of Plaintiff Kim Menefee and against Defendants N-Title, LLC, Camille White, and Don Klein in the amount of $37,017.54 in unpaid overtime compensation, $37,017.54 in liquidated damages, $104,362.50 in attorney fees, and $6,899.13 in litigation costs, plus post-judgment interest at the maximum rate permitted by law. Defendants N-Title, LLC, Camille White, and Don Klein are jointly and severally liable for these damages, fees, costs, and interest.

**IT IS FURTHER ORDERED** that all relief not expressly granted herein is **DENIED**.

**SO ORDERED.**

SIGNED this 9th day of July, 2021.

JAMES R. NOWLIN
SENIOR U.S. DISTRICT JUDGE